UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

R.B. and M.L.B., individually and on behalf of D.B.,

    Plaintiffs-Appellants,

-against-

New York City Department of Education,

    Defendant-Appellee.

---

**COMPLAINT**

12 CV 3763

ECF CASE

Plaintiffs R.B. and M.L.B., individually and on behalf of D.B., by their attorneys, Regina Skyer & Associates, L.L.P., as and for their Complaint, allege and state the following:

## PRELIMINARY STATEMENT

1. Plaintiffs R.B. and M.L.B., on behalf of their child, D.B., bring this action pursuant to Section 1415(i)(2) of the Individuals with Disabilities Education Improvement Act ("IDEA"), as amended (20 U.S.C. § 1400 *et seq.*), the pertinent implementing regulations promulgated under the Code of Federal Regulations, Article 89 of the New York State Education Law, and Part 200 of the Commissioner's Regulations against the New York City Department of Education (the "DOE"), seeking review and reversal of the State Review Officer's ("SRO") decision dated January 13, 2012, which reversed the Decision of an Impartial Hearing Officer that ordered the DOE to reimburse the Parents for tuition paid to a private school for the 2010-2011 school year. Decision of the SRO, a copy of which is appended hereto as Exhibit *1[1].

---

[1] Consistent with the usage below, exhibits preceded by an alphabetic reference were exhibits introduced by D.B.'s Parents at the IHO hearing. Numerical exhibits were introduced by the DOE. Citations beginning with "Tr." indicate pages within the transcript of the hearing before the IHO. Starred exhibits have been attached to this Complaint.

1

2. D.B. has autism and a significant sensory integration dysfunction, which impact on his ability to interact and communicate with other students and adults, attend to instruction, and otherwise function in a classroom and larger world environment. Ex. P; Tr. 224.

3. On September 14, 2011, after conducting three days of hearings and evaluating the testimony of seven witnesses, Impartial Hearing Officer ("IHO") Ellen Fluhr Thomas, Esq. determined that the DOE had failed to provide D.B. with a free appropriate public education ("FAPE"), as mandated by the IDEA and applicable state law. After considering the Parents' selected placement and the equities, the IHO ordered the DOE to reimburse D.B.'s Parents for the tuition they had paid to the Rebecca School, where D.B. was enrolled for the 2010-2011 academic year. (Decision of IHO Thomas ("IHO Decision") attached as Exhibit *2.) The SRO found that the IHO "relied on the testimony of the Parents' expert witness who opined that the district's program was not individualized to meet the student's needs, and that other students in the class with emotional and behavioral difficulties would lead to the student's regression." (SRO Decision at 7.) The IHO explicitly stated that she relied upon such expert testimony in finding "that the placement [offered by the District] is not appropriate because a school district must provide an IEP that is likely to produce progress, not regression." IHO Decision at 11.

4. The DOE appealed the IHO's decision by filing a Petition for Review with the New York State Education Department's Office of State Review. The DOE appealed the IHO's findings regarding the appropriateness of the DOE's proposed placement and the Rebecca School placement as well as the IHO's Decision that a consideration of the equities entitled the Parents to full tuition reimbursement. (IHO Decision at 11.) The SRO, in direct contravention of established precedent, completely ignored the IHO's credibility determinations. Instead, the

SRO, relying solely on documentary evidence, reversed the IHO's decision. The SRO offered no explanation or other discussion of his rationale for doing so.

5. Through this action, Plaintiffs seek a determination that:

    a. The DOE failed to provide D.B. with a FAPE for the 2010-2011 school year;

    b. The Rebecca School was an appropriate placement for D.B., as determined by the IHO. The SRO did not consider such appropriateness in his review, and the record makes clear that the placement was appropriate for D.B.;

    c. The equities favor D.B. and thus require, as determined by the IHO, that the DOE reimburse D.B.'s Parents for the Rebecca School tuition. The SRO did not consider such determination in his review, and the record makes clear that the IHO's decision on this issue was correct; and

    d. That D.B. is entitled to any other further relief as may be just under the circumstances.

## JURISDICTION

6. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343, and 20 U.S.C. § 1415(i)(2)(A) and (3)(A). This Court has supplemental jurisdiction over any state law claims herein asserted pursuant to 28 U.S.C. § 1367, as such state law claims form part of the same case or controversy as the claims for which this Court has original jurisdiction.

7. Venue is proper under 28 U.S.C § 1391(b) because the parties reside in this judicial district.

8. If successful, Plaintiffs are entitled to costs and attorneys fees under 42 U.S.C. § 1988(b) and 20 U.S.C. § 1415(i)(3)(B) *et seq.*

## PARTIES

9. Initials are used throughout this Complaint to preserve the privacy and confidentiality of the child, D.B., and the family consistent with the privacy provisions promulgated under section 1417(c) of the IDEA, and the Family Education and Privacy Rights Act, 20 U.S.C. § 1232(g).

10. Plaintiffs R.B. and M.L.B. are the Parents of D.B. They reside, along with D.B., in New York, New York.

11. Defendant DOE is a corporate body, created by Article 52 of the New York State Education Law § 2550 *et seq.*, that manages and controls the public school system of the City of New York. On information and belief, the DOE receives funding pursuant to the IDEA, and therefore must comply with that statute's provisions, including providing a FAPE to all students with educationally handicapping conditions, including D.B., who reside within New York City. *See* 20 U.S.C. § 1412. The DOE's principal place of business is 52 Chambers Street, New York, New York 10007.

## FACTUAL ALLEGATIONS

### D.B.'s Disability and Its Educational Impact

12. At the time of the hearing D.B. was a 12-year-old student classified with Autism. (Ex. 3). D.B.'s functioning is impacted most significantly by sensory integration dysfunction. (Ex. P; Tr. 224). His difficulty with processing sensory information affects how D.B. interacts, communicates, attends, and behaves. (Ex. P). Still, D.B. is a bright and verbal student, and capable of success in the classroom provided that he has individually designed special education

4

services and incorporated sensory integration occupational therapy to aid in attention and focus. *Id.*; Ex. 5.

**D.B.'s Educational History**

13. D.B. first received special education services as a toddler, and was diagnosed with Pervasive Developmental Disorder Not Otherwise Specified ("PDD NOS") at about 2 years of age. Ex. P.

14. D.B. has attended various special education programs over the years[2] (*id.*), as his disabilities thus far preclude participation in a general education classroom or community school. Ex. 3.

15. During the 2010-2011 school year D.B. attended the Rebecca School, which serves students with neuro-developmental delays in relating and communicating (Ex. B), and was the last agreed to placement between the Parents and the DOE.

16. Due to the Rebecca School's instructional programs, which incorporate sensory integration occupational therapy techniques throughout the day, and the DIR/Floortime methodology, D.B. made substantial progress between September 2006, when he initially enrolled at Rebecca, and the 2009-2010 school year. Ex. 5; see Tr. at 379-380.

**The Individualized Education Program Meeting**

17. The parties met on February 2, 2010, to create D.B.'s Individualized Education Program ("IEP") for the 2010-2011 academic year. D.B.'s mother, representatives from the Rebecca School, and the Department of Education's IEP team members attended this meeting. See Ex. 3.

18. The DOE did not intend to implement the program recommended for D.B. at

---

[2] D.B. attended the Central Park Early Learning Center at the recommendation of Respondent's CPSE.

the February meeting until July 2010, and provided no explanation or rationale for holding the meeting five months prior to this time. See Ex. 3 at 2.

19. Through no fault of the Parents, the program recommendation resulting from the February 2, 2010, meeting was wholly inappropriate for D.B. and was not reasonably calculated to confer an educational benefit upon him.

20. At the meeting M.L.B. and D.B.'s teacher at the Rebecca School attempted to meaningfully participate in the development of an appropriate program for D.B. However, the IEP team refused to develop a program individually designed to address D.B.'s needs, failed to consider recommending that D.B. continue to attend the Rebecca School despite admitting that he was making progress there, and only considered the 6:1:1 program generally recommended by the DOE for students with Autism, despite concerns and objections raised by M.L.B. at that meeting that such a program would not be appropriate for D.B. See Ex. 3.

21. The February 2, 2010 IEP team did not have sufficient evaluative data before them when creating D.B.'s IEP. The IEP team did not reference *any* neuropsychological, neuro-developmental, or psycho-educational evaluation. In fact, at the time of the IEP meeting, the DOE had failed to evaluate D.B. since he was four years old. Tr. 440.

22. Despite being informed that D.B. had made progress in the first half of the school year, was expected to continue making progress, and was expected to meet many of his goals between February 2010 and July 2010, the IEP team copied information regarding D.B.'s instructional levels and needs verbatim from the December 2009 Rebecca School progress report, resulting in an IEP that failed to establish meaningful functional levels, management needs and annual goals. Cf. Ex. 3 and Ex. 5.

23. Further dooming D.B. to an inappropriate program, the CSE failed to meaningfully

6

reference the Rebecca School Progress Report when creating D.B.'s IEP, with the exception of academic goals addressed in ¶22, supra, with the result being that valuable information about D.B.'s needs and appropriate instructional techniques was missing from the IEP. Cf. Ex. 3 at p. 3 and Ex. 5 at p. 5.

24. The goals included in D.B.'s IEP were generic and vague; were not measurable or assessable and did not appropriately address identified social-emotional and sensory integration occupational therapy needs; and failed to address D.B.'s adaptive physical education needs. See Ex. 3.

25. The DOE employees included goals in D.B.'s IEP that were to be addressed in the home environment and in group environments while simultaneously failing to provide services in the home or in a group designed to meet those goals. See Ex. 3.

26. In contravention of Federal and State law and regulations, the IEP team failed to recommend parent training and counseling for D.B. and his Parents. 8 NYCRR § 200.13 (d); 8 NYCRR § 200.1 (kk), (qq); 34 C.F.R. § 300.34, Ex I, Ex. J.

27. The IEP team failed to include a clearly effective and appropriate educational and therapeutic methodology on D.B.'s IEP.

28. The IEP team failed to consider recommending a non-public school program for D.B., and determined his school placement based solely on the 6:1:1 staffing ratio.

29. Accordingly, the Parents assert that the February 2010 program recommendation was a generic recommendation and not tailored to D.B.'s unique needs and abilities.

30. Over the objection of every participant in attendance with any significant exposure to D.B. and knowledge of his educational needs, the IEP team concluded that D.B. should be educated in a 6:1:1 class within Defendant's District 75. Upon information and belief,

the 6:1:1 program recommended for D.B. is Defendant's standard default program recommendation for students with autism attending public schools.

### DOE Designation of P.S. 169

31. On Friday June 18, 2010, after the close of the school day and more than four months after the IEP meeting, D.B.'s Parents received a final notice of recommendation, assigning D.B. to a 6:1+1 class at P.S. 169. The DOE waited until the last day it was permitted to issue the final notice of recommendation, then waited an additional day to mail the document to the Parents. See Ex. C.

32. On Monday June 21, 2010, the first business day after receipt of the final notice of recommendation, D.B.'s mother called the school to schedule a visit and was told that the first day that she could visit the program was June 24, 2010, which was also the last day of school for the 2009-2010 school year. Tr. 390.

33. D.B.'s mother visited P.S. 169 on June 24, 2010 with Andrea Albert, a Rebecca School social worker, and met with the P.S. 169 parent coordinator, Denise Velasquez. Ms. Velazquez was unable to provide any information about the proposed class or the students that would be placed in the class with D.B., despite the fact that the DOE proposed to place D.B. in this class on the next school day. *Id.*

34. As a result of the DOE's failure to provide a placement for D.B. until the very last moment, M.L.B. was able to visit P.S. 169 only on the last day of school when only one student was present in the classroom that D.B. would be placed in, and that student was playing a computer game throughout her visit. (Tr. 390-391; 396.) M.L.B. made several requests throughout July 2010 to re-visit P.S. 169 to see the class as it typically operated, i.e., as a class.

On July 28, 2010, P.S.169 affirmatively denied the Parent's request and stated that only one visit would be permitted. Tr. 396.

35. After visiting the school, D.B.'s Parents informed the CSE in writing that the offered placement was inappropriate for D.B., offered to meet with the CSE to see whether their concerns could be addressed, and notified the CSE that they intended to enroll D.B. at the Rebecca School and seek funding for this placement if the CSE failed to address their concerns. Ex. 2; Tr. 386.

36. The CSE failed to contact the Parents or otherwise respond to their letter. The Parents demonstrated their willingness to cooperate with the DOE throughout this process and complied with the statutory provision that "serves the important purpose of giving the school system an opportunity, before the child is removed, to assemble a team, evaluate the child, devise an appropriate plan, and determine whether a [FAPE] can be provided in the public schools." However, the DOE ignored the Parents' concerns and chose instead to leave itself liable for reimbursement for D.B.'s private school placement. Greenland Sch. Dist. v. Amy N., 358 F.3d 150, 160 (1st Cir. 2004).

37. By letter dated January 26, 2011, D.B.'s Parents requested an impartial hearing, seeking reimbursement for their tuition at the Rebecca School, because: (1) the District had failed to provide them with a meaningful opportunity to participate in the development of a special education program for D.B.; (2) the IEP team failed to rely upon sufficient evaluations; (3) the goals and objectives were vague and inadequate for D.B.; (4) the IEP team failed to provide for parent training and counseling; (5) the IEP team was not appropriately staffed, and (6) the CSE failed to offer an appropriate placement for D.B. and denied the Parents any ability to participate in the placement process. Ex.1.

**Proceedings Before the Impartial Hearing Officer**

38.  Impartial Hearing Officer Sharyn Finkelstein convened an impartial hearing on February 14, 2011 for the purposes of addressing D.B.'s pendency placement. IHO Finkelstein later recused herself and IHO Ellen Fluhr Thomas, Esq. was assigned to conduct a hearing over three additional days: May 9, June 14, and July 5, 2011. (IHO Decision at 1) During that time, IHO Thomas carefully listened to the testimony of DOE School Psychologist Jane O'Connor, P.S. 169 Special Education Teacher Geraldine Klemm, Supervisor of Pediatric Psychology and Neuropsychology at NYU Medical Center Dr. David Salsberg, Director of the Rebecca School Tina McCourt, Rebecca School Head Teacher Marguerite Cohn, and D.B.'s mother M.L.B. *See, e.g.*, Tr. 192; 314; 388.

39.  In a decision dated and distributed on September 14, 2011, IHO Thomas granted the Parents' request for reimbursement of the costs of D.B.'s enrollment at the Rebecca School[3]. See IHO Decision at 10-11.

40.  IHO Thomas held that the DOE did not provide D.B. with a FAPE, as required by the IDEA, thus entitling Plaintiffs to reimbursement. Specifically, IHO Thomas determined that the DOE failed to establish that the proposed 6:1:1 program and the resulting placement at P.S. 169 would allow D.B. to make educational progress and in fact found that it would result in D.B.'s regression. *Id* at 10-11.

41.  Specifically, IHO Thomas explicitly credited the expert testimony of Dr. David Salsberg, who has known D.B. since he was 19 months old, in determining that the District 75 6:1:1 program and placement was not appropriate for D.B. since it was likely to cause regression rather than progress. *Id* at 11.

---

[3] IHO Thomas issued a corrected decision on October 6, 2011, addressing certain clerical errors in the original decision.

42. Conversely, IHO Thomas found that the Rebecca School was an appropriate placement for D.B. and was reasonably calculated to offer him individually designed special education instruction sufficient to address his needs. *Id* at 11.

43. Lastly, IHO Thomas held that the equities favored reimbursing D.B.'s Parents for the tuition paid to the Rebecca School. D.B.'s Parents cooperated at all times with the CSE including by providing progress reports from the Rebecca School and providing consent for the DOE to observe D.B. in his school placement, and attempting to participate in the IEP development process. D.B.'s Parent also visited the proposed placement, attempted to revisit the program and provided the CSE with appropriate and timely notice of the Parents' rejection of the proposed program. *Id* at 9; 11.

### The Appeal to the State Review Officer

44. The DOE appealed the IHO's decision by serving its Verified Petition to the SRO on October 19, 2011, the last day it was permitted to do so. The DOE specifically appealed IHO Thomas's ruling that the DOE had failed to offer D.B. a FAPE and claimed that "the DOE offered D.B. an appropriate placement" and merely stated that "the IHO's reliance on Dr. Salsberg's testimony is misplaced," without offering any explanation for the rejection of this expert testimony. DOE Petition for Review at 2.

45. The Parents answered the DOE's Petition and cross-appealed the IHO's decision by timely serving their Verified Answer and Cross-Appeal on November 14, 2011. The Parents responded to the allegations contained in the Petition, urged that the SRO uphold the ultimate decision of the IHO, and specifically appealed the IHO's failure to make determinations that "(1) the recommended program was not individualized for D.B.; (2) the goals included in D.B.'s IEP were vague and inadequate; (3) the goals required that D.B. receive occupational therapy in a

group setting, yet the IEP failed to recommend occupational therapy services in a group setting; (4) the IEP failed to include the only effective methodology for the student, DIR/Floortime; (5) the IEP failed to include a provision for parent counseling and training; and (6) the DOE provided late notice of the student's assigned school." The Parents further "assert[ed] that the [IHO] did not address various issues raised in their due process complaint notice regarding the assigned school, including that the student would not have been functionally grouped in the assigned class," and that "the recommended 6:1+1 program was 'the usual and default program recommendation for students with [autism]' at district schools." (SRO Decision at 9.) The Parents also alleged that P.S. 169 was unable to provide all of the related services that the CSE had mandated that D.B. receive in school and that P.S. 169 would place him in two different classrooms during the 2010-2011 school year, one for the six week summer term and a second classroom beginning in September 2010. Cross Appeal at ¶54.

46.     The District answered the cross-appeal on December 12, 2011, and claimed, *inter alia*, that the issue of whether D.B. would be functionally grouped in the placement was "speculative inasmuch as the student had never attended the school," and that therefore "the DOE was not obligated to establish that [D.B.] would have been appropriately grouped upon the implementation of his IEP." This position is contrary to Federal and State law and Regulation and established case law within this jurisdiction. Verified Answer at 4; SRO Decision at 20; see *Board of Education v. Tom F.*, 193 Fed.Appx. 26 (2d Cir 2006), aff'd, 128 S.Ct. 1 (2007).

47.     With regard to the Parents' cross appeal, the DOE urged that the SRO should overlook its failure to provide parent counseling and training for D.B.'s Parents and should instead rely upon testimony from Ms. O'Connor, the DOE's special education teacher, who is assigned to administrative duties and who has never taught in a 6:1+1 class, and who was

unaware of the school which D.B. would be placed, that parent counseling and training would have likely been provided at the public school placement, even though Ms. O'Connor testified that she was not familiar with the placement recommended for D.B. See DOE's Verified Answer at 6; SRO Decision at 20; Tr. at 104.

48. Furthermore, despite having ample opportunity to satisfy their burden of proof on this issue by eliciting testimony from their two witnesses who were employees at P.S. 169, the DOE failed to provide any testimony regarding the availability of parent counseling and training in the proposed program. See SRO Decision at 20.

49. The SRO issued a decision on January 13, 2012, annulling the decision of IHO Thomas and dismissing the Parents' Cross Appeal. SRO Decision at 25.

50. The SRO erroneously and inappropriately excused both the DOE's further failure to evaluate D.B. and the DOE's further failure to even attempt to prove that it did not need to conduct an evaluation of D.B. The SRO's determination on this issue is arbitrary and capricious, is not supported by the record below, and is in violation of New York State law, which places the burden of proof on this issue squarely on the District. See SRO Decision at 12-13; N.Y. Educ. Law §4401(c).

51. The SRO erred in determining that by reviewing a November 2009 classroom observation and December 2009 Progress Report from the Rebecca School, "the CSE had sufficient evaluative data with which to formulate the student's program." He ignored the fact that the IEP team was obligated to develop an IEP that projected D.B.'s functional level as of the date that the IEP would be initiated, July 2010, and instead included outdated information about D.B.'s functional levels and needs as of the date of the December 2009 Progress Report. The record shows that D.B. was expected to make significant progress between February 2010 (when

the IEP was developed) and July 2010 (and in fact did so), and that the IEP team possessed this information at the time of the IEP meeting. (SRO Decision at 14; Tr. at 137). The SRO ignored the Parents' allegations, which are fully supported by the record, that the February 2010 IEP would have been outdated before a public school would attempt to implement the program. The SRO further ignored the fact that the Rebecca School goals were six-month goals designed to be addressed at Rebecca between December 2009 and June 2010, at which point new goals would be developed. SRO Decision at 16.

52.  The SRO properly determined that "a review of the IEP shows that the annual goals are not measurable," yet incredibly and in contravention of an essential provision of the IDEA, excuses such failure. *Id.*

53.  The SRO acknowledged that "the sensory goals in the IEP reference the home environment," and that the IEP team failed to provide for any services in the home environment, then remarkably and inappropriately dismissed any concern over such practice. *Id* at 18.

54.  Although the SRO admonished that "the district should have taken greater care in crafting the student's annual goals...," the SRO did not conclude that the cumulative effect of the failures detailed above operated to deny D.B. a FAPE and his Parents their right to meaningfully participate in his education. *Id* at 18.

55. The SRO correctly states that parent training and counseling is a mandatory related service for any child who, like D.B., is classified as Autistic and *must* be detailed in any IEP for a child classified as Autistic and recognizes that no individualized parent training or counseling was included in D.B.'s IEP. (34 C.F.R. § 300.347 (a)(3); 8 NYCRR § 200.13 (d); 8 NYCRR § 200.1 (kk), (qq); 34 C.F.R. § 300.34.) The SRO then excuses the failure to provide such training and counseling here and cites to case law which excuses this failure only when the

District demonstrates that the recommended program would have actually provided parent counseling and training. Here however, the DOE did not demonstrate that such training and counseling would be provided. Thus, pursuant to the case law cited by the SRO, such failure in this instance should not be excused. SRO Decision at 20-21.

56.   The SRO improperly determined that the District's failure to include a methodology on D.B.'s IEP was excusable as "different methodologies were used in the district's specialized schools, and the CSE could not say for certain that the placement would only use a specific methodology." SRO Decision at 21-22.

57.   This determination ignores the fact that the IDEA expressly defines "specially designed instruction" to include the "content, **methodology**, [and] delivery of instruction." This demonstrates Congress's recognition that evidence of methodologies used successfully or unsuccessfully to teach the individual student in question is integral to a determination of the appropriateness of instruction and should be included in D.B.'s IEP. Furthermore the SRO thereby excuses the DOE's systemic failure to meet its obligation to determine the appropriate methodology for all students, including here D.B.[4] See 34 C.F.R. §300.39(a)(1)[5] (emphasis added).

58.   The SRO again ignores the fact that the DOE is legally required to demonstrate the appropriateness of its program and cites to testimony that the IEP team "did not know if other methodologies would also work with [D.B.]." He then held that the record does not support the proposition that D.B. could only be instructed using one methodology. In effect, the SRO

---

[4] Such excusal of a failure to meet Congress's mandate on the basis that the DOE regularly fails to meet that mandate is not the determination of a neutral appellate tribunal, but rather that of a biased advocate for the DOE.

[5] See also County Sch. Bd. Of Henrico County, Va. v. R.T., 433 F. Supp. 2d 657 (E.D. Va. 2006) (holding that school district's IEP was not "specially designed" for severely autistic "stimming" child where evaluations showed that the child only had the most basic skills, could not make any educational progress until he stopped stimming, and could not stop stimming without intensive 1:1 ABA).

reversed the burden of proof and made his ruling based on the implicit – and demonstrably incorrect – premise that it was the Parents' burden to prove that only one methodology would be appropriate for their son, rather than the DOE's burden to prove that it had provided a program that would utilize a methodology appropriate for D.B.[6] SRO Decision at 21-22.

59. The SRO further erred in determining that D.B. would be grouped suitably in a proposed classroom when that classroom employed a curriculum designed to educate students with abilities that were far below D.B.'s level and in a proposed school where D.B. would be exposed only to students with significant emotional and behavioral disturbances, all of which Dr. Salsberg stated would likely result in D.B.'s regression. Further, the SRO failed to consider the record evidence in summarily dismissing the Parents' other claims regarding the inappropriateness of the proposed placement, including the inability of the school to provide the mandated related services, and the inability of the school to provide D.B. with sensory integration occupational therapy to address his needs[7]. SRO Decision at 23-24.

60. In order to reach his decision, the SRO overrode the express credibility determinations made by the IHO, who heard the testimony first-hand. The SRO further failed to credit the testimony of those witnesses with actual experience of educating and evaluating D.B. over his entire educational career. These witnesses testified that the proposed classroom was inappropriate for D.B. and would likely lead to his regression. The SRO's failure to provide deference to the IHO's findings with regard to credibility and in otherwise overturning the IHO's determination that an appropriate education was not provided is arbitrary and capricious and not supported by the record below. See Doyle v. Arlington County School Bd., 953 F.2d 100, 104 (4th Cir. 1991).

---

[6] Again, such a reversal of the burden of proof is not the action of a neutral tribunal but of an advocate for the DOE.

[7] Again, this ignoring of evidence against the DOE shows a lack of neutrality.

61. The SRO committed legal error by holding that the question of functional grouping was not ripe for review because D.B. had not been enrolled in the public school and any such review would be hypothetical. This is incorrect as a matter of law and in fact makes a mockery of this whole procedure. In addition, once the DOE had selected the classroom for D.B. and defended it at hearing, they opened the door to the issue of the appropriateness of the placement, and thereby made such designation appropriate for review, especially given that New York State explicitly places the burden of proving such appropriateness on the DOE. See N.Y. Educ. Law §4401(c).

62. The SRO's cursory determination that the 6:1+1 placement would have permitted D.B. to "have been functionally grouped in the assigned class for the 2010-11 school year," is not supported by the record evidence, and ignores the fact that the DOE admitted that D.B. would have been removed from the only class defended at hearing and placed in a new class in September 2010. The DOE failed to provide the Parents with any information about this new September class prior to the hearing and then failed to present any evidence regarding this new class at the hearing. It was not until Ms. Klemm was subject to cross examination that it was admitted, over the objection of the DOE's attorney, that D.B. would have been in Ms. Klemm's class for only six weeks. SRO Decision at 23; see Tr. at 56.

63. The SRO erred in concluding that "the hearing record supports a finding that the CSE's recommendation that the student attend a 6:1+1 placement in a specialized school would have addressed his needs." The SRO's decision to credit the testimony of one witness, Ms. Klemm, who has never met D.B. and knew of him only from a review of his IEP over the testimony of those witnesses, including D.B.'s teacher, the head of the Rebecca School, Dr. Salsberg, and D.B.'s mother, with long-term, intimate and direct knowledge of D.B. and his

academic, therapeutic and emotional needs, was unreasonable and unsupported by the record. Further, in so holding, the SRO explicitly and inappropriately overruled the IHO on determinations of credibility. The SRO's determinations on this issue are arbitrary and capricious and not supported by the record below. SRO Decision at 23.

64. The SRO cursorily notes countervailing testimony and lists statements contradictory to his determination, only in recounting the procedural history of the case, and then, without analysis or explanation, leaps to a conclusion squarely at odds with the facts and the weight of the evidence. (Ex. SRO Decision at 24.) Significantly, the SRO does not even mention the expert testimony of Dr. Salsberg in his analysis of the facts and law of the case, despite the fact that the IHO made clear that Dr. Salsberg's testimony was a significant factor in her decision. The SRO's determinations on the District's failure to offer an appropriate education are arbitrary and capricious and not supported by the record below. Further, the SRO failed to consider the cumulative effects of the repeated failures of the DOE to comply with the procedural and substantive requirements of the IDEA and New York State law.

65. The SRO did not overrule the IHO's determination that the Rebecca School was an appropriate placement for D.B. and that the equities favored D.B.'s Parents' request for reimbursement. Such determinations are supported by the record evidence and are entitled to deference by this Court.

**First Claim for Relief**
**(Denial of FAPE in Violation of the IDEA)**

66. Plaintiffs repeat and reallege the allegations stated in paragraphs 1 through 65 as if fully set forth herein.

67. In violation of the IDEA, 20 U.S.C. § 1400 *et seq.*, Defendant denied D.B. a FAPE for the 2010-2011 academic year. Such denial results from the substantive inadequacies

in the IEP and the proposed placement at P.S.169, as described above or as otherwise may be established.

## Second Claim for Relief
### (Denial of Rights Under Section 504 of the Rehabilitation Act)

68. Plaintiffs repeat and reallege the allegations stated in paragraphs 1 through 65 as if fully set forth herein.

69. By failing to confer the benefits provided to D.B. under the IDEA as amended (20 U.S.C. § 1400 *et seq.*), Defendant has violated Section 504 of the Rehabilitation Act (29 U.S.C. § 794) and the regulations promulgated thereunder.

## Third Claim for Relief
### (Denial of Rights Under New York State Law)

70. Plaintiffs repeat and reallege the allegations stated in paragraphs 1 through 65 as if fully set forth herein.

71. Defendant has violated Article 89 (N.Y. Educ. Law § 4400 *et seq.*) and regulations promulgated thereunder by failing to provide D.B. with a FAPE, as set forth above or as otherwise may be established.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court:

a. reverse the SRO's decision of January 13, 2012;

b. hold that the DOE failed to provide D.B. with a FAPE for the 2010-2011 school year;

c. affirm the Impartial Hearing Officer's decision that the Rebecca School placement was appropriate for D.B. for the 2010-2011 school year;

19

d.  affirm the Impartial Hearing Officer's decision that a consideration of the equities supports the Parents' request for reimbursement of tuition paid to the Rebecca School for the 2010-2011 school year;

e.  order the DOE to reimburse Plaintiffs for tuition paid to the Rebecca School for the 2010-2011 school year;

f.  declare that Plaintiffs are the substantially prevailing party;

g.  grant leave, pursuant to governing law, to Plaintiffs' counsel to submit a fee application for the purpose of recovering statutory attorney's fees and other recoverable costs incurred at the administrative level, the SRO level, and in this action; and,

h.  grant Plaintiffs any additional relief as the Court deems appropriate.


Dated: New York, New York
May 11, 2012

Respectfully Submitted,

**SKYER & ASSOCIATES, L.L.P.**

By: _____
JESSE COLE CUTLER
SKYER & ASSOCIATES, L.L.P.
276 Fifth Avenue, Suite 402
New York, NY 10001
(212) 532-9736
jcutler@skyerlaw.com

*Attorneys for D.B.*