USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: SEP 27 2013

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
R.B. and M.L.B.,
                         Plaintiffs,

         -v-

NEW YORK CITY DEPARTMENT OF EDUCATION,
                         Defendant.
------------------------------------------------------------------X

12 Civ. 3763 (AJN)

MEMORANDUM AND
ORDER

ALISON J. NATHAN, District Judge:

Plaintiffs R.B. and M.L.B. bring this action, individually and behalf of their minor child, D.B., pursuant to the Individuals with Disabilities Education Act ("IDEA"), against Defendant New York City Department of Education ("DOE"), seeking review of the January 13, 2012, administrative decision of State Review Officer ("SRO") Justyn P. Bates. In that decision, the SRO reversed the prior decision of New York State Impartial Hearing Officer ("IHO") Ellen Thomas, and concluded that the individualized education plan ("IEP") that the DOE developed for D.B. was sufficient to provide D.B. with the free appropriate public education ("FAPE") that he is entitled to under the IDEA.[1] Because Plaintiffs assert that the DOE failed to provide a FAPE for D.B., they seek reimbursement for the cost of his enrollment in the Rebecca School, a private school in which they unilaterally opted to enroll D.B. for the 2010-11 school year. The parties have filed cross motions for summary judgment. For the reasons discussed below, the Court grants Defendant's Motion for Summary Judgment and denies Plaintiffs' motion for the same.

## I.     FACTUAL BACKGROUND

------

[1] Because this Court has recently discussed the statutory background of the IDEA in *P.G. v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 05235 (AJN), 2013 WL 4055697, at *1-2 (S.D.N.Y. July 22, 2013), the statutory framework will not be described in detail here, except as necessary.

1

**A.** <u>D.B.'s Educational History</u>

D.B. was born in October 1998. Def. 56.1 ¶ 1. At the age of 19 months, D.B. was diagnosed with a sensory integration dysfunction and, shortly thereafter, with Pervasive Developmental Disorder, Not Otherwise Specified. Pl. 56.1 ¶ 6. As a result of these diagnoses, D.B. received special education services from New York State's Early Intervention program. Pl. 56.1. ¶ 8. When D.B. was approximately three years old, he was evaluated by the DOE's Committee on Preschool Special Education, Pl. 56.1. ¶ 9, and referred to the Central Park Early Learning Center ("CPELC"), which he attended for about two years. Tr. 379. During the year in which D.B. turned five, the local Committee on Special Education ("CSE"), evaluated D.B., classified him as a "child with a disability," as defined in the IDEA, 20 U.S.C. § 1401(3), and developed an IEP for him. Pl. 56.1 ¶ 10; Def. 56.1 ¶ 3. Because the CSE did not offer D.B. a placement for any of the years between then and the 2009-10 school year, he received private school placements, at the school district's expense, during that time. Pl. 56.1 ¶¶ 10, 11, 53; Tr. 380. The last placement that Plaintiffs and Defendants agreed upon was the Rebecca School, which D.B. attended for the 2009-10 school year. Tr. 11; Pl. 56.1 ¶ 12.

**B.** <u>Preparations for the CSE Meeting</u>

In January 2010, Plaintiffs' local CSE notified them of the CSE's plan to conduct a meeting on February 2, 2010 (the "CSE meeting") to develop an IEP for D.B. for the 2010-11 school year. Ex. 12 at 7-1; Tr. 418. In response, M.L.B. sent the DOE a copy of D.B.'s December 2009 Progress Report (the "2009 Report") from the Rebecca School. Tr. 419; *see* Ex. 12 at 5. The 2009 Report contained a description of his current academic and social performance as well as reports from each of D.B.'s teachers. The report also contained several short-term and

long-term goals, but did not include deadlines by which D.B. would be expected to complete them.

According to Jane O'Connor, a DOE special education teacher, prior to the CSE meeting, she and Dr. Patricia Pape (a DOE school psychologist) reviewed D.B.'s 2009 Report, as well as his 2009-10 IEP and a November 2009 DOE classroom observation of D.B. Tr. 78, 113-14; Def. 56.1 ¶¶ 6-7. Ms O'Connor also stated that, in preparing for these meetings, DOE members generally review the prior year's IEP, though Plaintiffs contest whether that procedure was followed in this instance. *Compare* Def. 56.1 ¶ 6, *with* Pl. Resp. to Def. 56.1 ¶ 6. Based on her review of these documents, prior to the CSE meeting, Dr. Pape prepared a draft of D.B.'s 2010-11 IEP. Def. 56.1 ¶ 9. Ms. O'Connor opined that, because Dr. Pape was able to create this draft, Dr. Pape must have believed -- as Ms. O'Connor did -- that she had sufficient information to develop an IEP. Tr. 114.

Neither Plaintiffs nor their attorney wrote to the DOE objecting to the documents that the CSE team reviewed or requesting that additional testing be conducted on D.B. Def. 56.1 ¶ 27; Tr. 412. According to Ms. O'Connor, the meeting could have been adjourned or rescheduled if M.L.B. or other members of the CSE team thought additional information or evaluations were needed. Tr. 138. M.L.B. testified that she thought the DOE had requested to evaluate D.B., and that she thought she had agreed. Tr. 440. However, the DOE asserts that M.L.B. refused its previous requests to evaluate D.B. *Compare* Pl. 56.1 ¶ 22, *with* Def. Resp. to Pl. 56.1 ¶ 22.

### C. The CSE Meeting

Dr. Pape, Ms. O'Connor, M.L.B., and a parent member[2] were present at the CSE meeting on February 2, 2010. Pl. 56.1 ¶ 14. Ms. Carter Swope, D.B.'s special education teacher at the

---

[2] A "parent member" is a parent in the school district whose child previously received an IEP. N.Y. Educ. Law § 4402(1)(b)(1)(a).

Rebecca School, participated by phone. Pl. 56.1 ¶ 15. Dr. Pape began the meeting by asking M.L.B. to state her concerns about D.B.'s educational needs. Def. 56.1 ¶ 11. M.L.B. mentioned D.B.'s "need for sensory training, occupational intervention to stay involved in the classroom, and his need to improve his pragmatic language skills." Def. 56.1 ¶ 12; Tr. 80-81.

After hearing M.L.B.'s concerns, the CSE reviewed and discussed the draft of D.B.'s 2010-11 IEP that Dr. Pape had previously prepared. Def. 56.1 ¶ 9. Ms. Swope agreed with Dr. Pape's estimates that D.B. functioned at a 2.0 instructional (grade) level in decoding, 1.7 in reading comprehension, 1.8 in math comprehension, and 1.6 in math problem solving. Def. 56.1 ¶ 16; Ex. 12 at 2-2. Ms. Swope also mentioned that the Developmental, Individual-Difference, Relationship-Based Model (also known as "Floortime" or "DIR") had been successful with D.B. Pl. 56.1 ¶ 28. The CSE team indicated that the IEP would not refer to a specific methodology, but that counseling would address D.B.'s social and emotional needs. Tr. 133; Ex 12 at 2-2.

In reviewing the draft IEP, the CSE team discussed annual goals and short-term objectives for D.B. Def. 56.1 ¶ 24; *see* Ex. 12 at 2-2. M.L.B. was told at the meeting that the goals and objectives from the 2009 Report would be "insert[ed], to the extent possible, into the IEP." Tr. 384. Indeed, twelve of the annual goals—two of which referenced the "home environment[ ]"—were copied directly from the 2009 Report. *Compare* Ex. 3, *with* Ex. 5. Nearly all of the short-term objectives were identical to goals in the 2009 Report, except that percentages of accuracy or numbers of correct trials had been added. *Compare* Ex. 12 at 3, *with* Ex. 12 at 5.

M.L.B. read the IEP goals for decoding, reading, writing, math, and related services (occupational therapy, speech and language therapy, and counseling) to Ms. Swope, who agreed that the goals were appropriate. Def. 56.1 ¶ 26; Ex. 12 at 2-2. According to Ms. O'Connor, none

of the members of the CSE team objected to the goals. Tr. 96. In a subsequent letter to the DOE (discussed below), Plaintiffs expressed concern that the "recommended program . . . would not be able to appropriately address the goals contained within [D.B.]'s IEP," but did not mention the appropriateness of the goals themselves or the criteria used to measure the goals. Ex. 11 at H. Neither Plaintiffs nor their attorney wrote to the DOE objecting to the goals or measurement criteria on any other occasion. Tr. 410, 413.

Next, the CSE team discussed the type of program that D.B. would receive; it considered both 10-month and 12-month programs, but found a 10-month program "inadequate to meet [D.B.]'s academic [and] social/emotional needs." Ex. 12 at 3-14. Within the 12-month program, in addition to the 6:1:1 (students : parents : paraprofessionals) staffing ratio that it ultimately recommended, the CSE team also considered 12:1:1 and 8:1:1 ratios, but rejected these as "too high to appropriately meet [D.B.]'s needs." *Id.* The CSE team agreed that a 12-month, 6:1:1 program in a specialized school was appropriate for D.B. Ex. 12 at 2-2. M.L.B. told the CSE team that she was concerned about a 6:1:1 program because the DOE "considers that size classroom for very low functioning children, and that's not where [D.B.] falls in terms of functioning levels. So I would like him to be in a small classroom with appropriate peers." Tr. 386.

The CSE team then discussed and revised D.B.'s related service mandates.[3] Ex. 12 at 2-2, 3-15. The final version of D.B.'s 2010-11 IEP included services of occupational therapy ("OT") (4 x 30 minutes per week), speech and language therapy ("SLT") (4 x 30 minutes per week individually, 1 x 30 minutes per week in a group of two), and counseling (1 x 30 minutes per week individually, 1 x 30 minutes per week in a group of two). Def. 56.1 ¶ 21; Ex. 12 at 3-

---

[3] "Related services" are defined as "developmental, corrective, and other supportive services as are required to assist a student with a disability . . . includ[ing] speech-language pathology, . . . occupational therapy, counseling services . . . and other appropriate support services." 8 NYCRR § 200.1(qq).

15. The team also recommended adapted physical education (PE), but did not include any goals or objectives for PE in the 2010-11 IEP. Pl. 56.1 ¶ 27; Ex. 12 at 3-6. The IEP does not mention parent training or counseling. *See* Ex.12 at 3. According to Ms. O'Connor, the CSE team "typically . . . tell[s] the parents . . . the program that will be offered encompasses parent training." Tr. 133. The record does not indicate that the CSE team informed M.L.B. that the program designed during the CSE meeting included parent training, and the IEP did not recommend home-based services. Pl. 56.1 ¶ 111; Ex. 12 at 3.

Finally, the CSE team discussed how the goals in the IEP would be measured. The annual goals did not contain evaluative criteria, but each of the short-term objectives stated either a percentage of accuracy or number of correct trials within which the objective needed to be completed. Ex. 12 at 3. The "Participation in Assessments" section of the IEP indicated that the goals would be "measured by teacher-made materials and teacher-provided observation." *Id.* Each of the pages of the IEP on which goals and objectives were listed states that "[t]here will be 3 reports of progress per year." *Id.*

At the conclusion of the CSE meeting, the CSE team provided M.L.B. with a Notice of Recommended Deferred Placement, which indicated that, while D.B. was entitled to an immediate placement, it "may be in the best interest of your child" to defer placement until June 30, 2010 because D.B.'s "IEP is developed for [the] 2010-2011 school year." Ex. 12 at 8-1; Tr. 388.

**D.** The Unilateral Placement

The Rebecca School, which D.B. had attended since 2006, required the payment of a deposit in April 2010 to reserve a place for D.B. for the 2010-11 school year. Ex. 11. Plaintiffs signed an Enrollment Contract on April 21, 2010, and paid a deposit the next day. Ex. 11 at G,

O-3. On June 16, 2010, Plaintiffs' attorney sent the DOE a letter (the "June 16 letter"), indicating that Plaintiffs were "placing [D.B.] at the The Rebecca School School . . . for academic year 2010-2011 commencing on July 6, 2010, and intend[ed] to seek funding for this placement from the district." Ex. 11 at H-1. This letter was sent to comply with federal law; which conditions reimbursement eligibility on parents timely notifying DOE that they are rejecting the proposed placement and providing their reasons for so doing. *See* 20 U.S.C. § 1412(a)(10)(C)(iii)(I). At the time the letter was sent, Plaintiffs had not received any communications from the DOE since the CSE meeting. Ex. 11 at H-2; Tr. 437.

**E.** The DOE's Recommended Placement

On June 18, 2010, Plaintiffs received a Final Notice of Recommendation from the DOE (dated June 15, 2010), which restated the CSE team's recommendation of a 6:1:1 class in a specialized school and offered D.B. a placement at P.S. M169's Robert F. Kennedy School ("P.169"). Tr. 389; Ex. 12 at 6-1. On June 24, 2010, M.L.B. and Andrea Albert (D.B.'s social worker at the Rebecca School), were given a tour of P.169 by Denise Velazquez, the school's parent coordinator. *See* Tr. 172-73, 390-96, 424-25. During the tour, M.L.B. observed that the school did not have suspended equipment, which Ms. Velazquez confirmed. Tr. 392-93. Ms. Velazquez also noted that there had been a "shortage" of service providers during the school year, but that to meet the students' related service needs, schools could "contract out with independent agency providers," who would come to the school and provide the services. Tr. 162-63. If a particular student was unable to receive his mandated related services during the school day, his family would receive a related service authorization, which would allow the student to receive the mandates from independent service providers outside of school. Tr. 132.

**F.** Dr. Salsberg's Evaluation

After her visit to P.169, M.L.B. asked Dr. Salsberg, D.B.'s neuropsychologist, to conduct a new formal evaluation of D.B. Dr. Salsberg had originally conducted an evaluation in 2002, and had "recommended that [D.B.] attend a small, highly-structured language-based special education class . . . and home-based [Applied Behavioral Analysis ("ABA")]. Tr. 357; Ex. 11 at P. Dr. Salsberg completed his reevaluation in August 2010 ("the 2010 evaluation") Tr. 439; Ex. 11 at P. In writing the 2010 evaluation, Dr. Salsberg reviewed D.B.'s medical history and noted that "[i]n October 2001, [D.B.] was evaluated by Cecelia McCarton, M.D., who recommended [ABA] therapy at home and school. [D.B.] then attended an ABA classroom the following year at CPELC with progress noted, although no ABA therapies were provided within the home setting." *Id.* at P-1.

Dr. Salsberg, who had worked as a paraprofessional for two sessions prior to attending graduate school and who visits "dozens of schools a year," estimated that he had observed DOE 6:1:1 programs "[a]t least five or six [times] in the last few months [prior to July 2011]." Tr. 332, 347. Based on these observations, Dr. Salsberg opined that programs with the level of "intensity . . . specialty and . . . individualization . . . and [highly qualified] aides" that D.B. has at the Rebecca School are "very rare" in D.B.'s district. Tr. 333. Dr. Salsberg also stated that, "if [D.B.] was in a class with [students who had] more emotional or behavioral difficulties," he was "sure that [D.B.] would regress." Tr. 334. Dr. Salsberg also noted that he had observed classes using the Treatment and Education of Autistic an Communication-Related Handicapped Children ("TEACCH") method, which P.169 used, and "would not feel that [TEACCH] [wa]s an appropriate modality for [D.B.]." Tr. 335. In his testimony before the IHO, Dr. Salsberg also mentioned that he had received ABA training, but was not certified in ABA. Tr. 341. He did not comment on the appropriateness of ABA for D.B. or mention any other methodologies.

M.L.B. attempted to schedule another visit to P.169 with Dr. Salsberg, but was informed that the school had a policy of allowing only one visit per summer. Pl. 56.1 ¶ 51. After learning that Dr. Salsberg would not be able to visit the school, Plaintiffs decided not to accept the DOE placement, and D.B. attended the Rebecca School for the 2010-11 school year. Pl. 56.1 ¶ 53; Tr. 396-97.

### G. The Rebecca School Program

The Rebecca School is a private special education school that serves children with "neurodevelopmental delays in relating and communication," including children diagnosed with autism. Pl. 56.1 ¶ 13. The school uses "sensory integration occupation[al] therapy techniques" and the "DIR/Floortime methodology." Pl. 56.1 ¶ 13. D.B.'s 2009 Report from the Rebecca School indicates that he "requires intense vestibular input." Ex. 12 at 5-7. One of the Rebecca School's methods of providing this type of input was with "suspended equipment," such as "swings, slings, trapezes, [and] Lycra hanging things that [D.B.] can get inside." Tr. 433. According to M.L.B., suspended equipment "grounds [D.B.] and makes him more organized so that he's more ready to learn academics and to be more social." Tr. 403. As part of his program at the Rebecca School, D.B. received thirty-minute sessions of OT four times per week; SLT five times per week; and counseling (once per week individually; and once in a group of two). Ex. 11 at P-2; Tr. 294. D.B. also received art therapy and music therapy, each twice per week. Ex. 11 at P-2.

In addition to the services he received at the Rebecca School, D.B. also received services outside of school (also referred to as "home-based" services), which included tutoring, music therapy, OT, play therapy, and counseling. Tr. 397, 413-17; Ex. 11 at P-2. These services were paid for by the Plaintiffs, and separate from D.B.'s Rebecca School tuition. Tr. 404-05. M.L.B.

stated that she provides D.B. with these services because "he's delayed, and I . . . want to move him forward as much as possible." *Id.* at 397.

**H.** The Impartial Hearing and Decision

On January 25, 2011, M.L.B. and R.B. filed a due process complaint requesting a hearing before an IHO, Portions of which occurred between February 14 and July 5, 2011. Pl. 56.1 ¶¶ 36, 74; *see* Ex. 12 at 1-1. D.B.'s parents called four witnesses: Ms. McCourt (the Rebecca School's director); Ms. Cohn (D.B.'s special education teacher); Dr. Salsberg; and M.L.B. Pl. 56.1 ¶ 77. The DOE called three witnesses: Ms. Klemm (the teacher who would have taught D.B. at P.169); Ms. O'Connor; and Ms. Velazquez. Def. 56.1 ¶ 38. The testimony of these witnesses has been incorporated into the facts above, and will not be repeated here.

The IHO found that the "parents had an opportunity to fully participate in the process," and that the information the CSE relied upon in providing the IEP was reasonable. IHO Dec. at 10. Nonetheless, the IHO concluded that the DOE's recommended placement at P.169 was inappropriate for D.B. In coming to this conclusion, the IHO cited Dr. Salsberg's statement: "I feel that if [D.B.] were in a class with . . . [children with] . . . more emotional or behavioral difficulties . . . . I'm sure that he would regress." *Id.* at 10-11 (alteration and omissions in original); *see also* Pl. 56.1 ¶¶ 79, 80. Accordingly, the IHO held that the DOE had failed to offer D.B. a FAPE, and that D.B.'s parents were entitled to tuition reimbursement for the 2010-11 school year because the unilateral placement was appropriate and "the equities d[id] not preclude or diminish the parents' entitlement to tuition reimbursement." IHO Dec. at 11. The DOE appealed to the SRO, and the parents cross-appealed. Pl. 56.1 ¶¶ 84, 85; Def. 56.1 ¶ 42.

**I.** The SRO's Decision

The SRO found that the CSE team "did not engage in predetermination" and allowed the parents an "opportunity to participate" in the IEP process, and that the CSE relied on "sufficient evaluative data" in formulating the IEP. *Id.* The SRO noted that record was "not clear as to whether the student was required to have a triennial evaluation." *Id.* at 13. Nonetheless, it concluded that because the IEP itself was marked as an "annual review," and because "the parents ha[d] not contested this," the DOE was not required to conduct a full evaluation of D.B. *Id.* at 13-14. Additionally, the SRO found that the 6:1:1 program recommended in the IEP was not a "'default' program recommendation for students with autism," but a "recommendation based on this student's individualized needs." *Id.* at 19.

Though the annual goals in the IEP were "not measurable," the SRO found them to be adequate: "the short term objectives 'contained sufficiently detailed information regarding the conditions under which each objective was to be performed and the frequency, duration, and percentage of accuracy required for measurement of progress' and remedied any deficiencies in the annual goals.'" *Id.* at 16 (quoting *Tarlowe v. N.Y.C. Bd. of Educ.*, No. 07 Civ. 7936 (GEL), 2008 WL 2736027, at *9 (S.D.N.Y. July 3, 2008)); *see also* Def. 56.1 ¶ 43. The SRO also found that references in two of the annual goals to the "home environment[ ]" did not indicate that "the student required home-based services in order to receive a FAPE." *Id.* at 18. It reasoned that the absence of a parent counseling provision did not result in the denial of a FAPE in light of the "parent counseling and training services that [Plaintiffs] had received at the Rebecca School since 2006." *Id.* at 21. Similarly, while the IEP did not contain goals or objectives specifically related to adapted PE, Pl. 56.1 ¶ 27, the SRO found that "the student's needs would have been met in this area as his sensory issues and need for a small classroom with adult supervision and recommendations to address those needs were . . . reflected in the IEP." *Id.* at 17-18. Overall,

the SRO found that "the annual goals, when combined with the short-term objectives, were sufficient," and did not result in the denial of a FAPE. *Id.* at 18.

The SRO determined that the fact that the IEP did not refer to a specific methodology did not deny D.B. a FAPE because "the hearing record does not reflect that [D.B.] could only receive educational benefits through the exclusive use of the DIR/Floortime methodology." *Id.* at 22. The SRO also found that D.B. "would have been functionally grouped in the assigned class" and that "the district was capable of providing [D.B.] with [the] mandated [related] services" in his IEP. *Id.* at 23.

Ultimately, the SRO held that the DOE offered D.B. a FAPE for the 2010-11 school year because the IEP "while not in perfect compliance with State regulations, was nevertheless reasonably calculated to enable the student to receive educational benefits." Pl. 56.1 ¶ 99 (quoting *id.* at 24). Having thus concluded, the SRO did not address whether the Rebecca School was an appropriate placement for D.B. or whether the equities favored reimbursement. *Id.* ¶ 116.

Plaintiffs filed this action on May 11, 2012, challenging the SRO's decision.

## II.    LEGAL STANDARD

Although, as is typical in IDEA cases, the parties have submitted their papers in the form of summary judgment motions—filing competing "56.1 statements" along with their notices of motion—judges in this district have observed that "the procedure [in a federal IDEA appeal] is in substance an appeal from an administrative determination, not a summary judgment." *S.F. v. N.Y.C. Dep't of Educ.,* No. 11 Civ. 870 (DLC), 2011 WL 5419847, at *7 (S.D.N.Y. Nov. 9, 2011) (quoting *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.,* 397 F.3d 77, 83 n.3 (2d Cir. 2005)); *P.G.,* 2013 WL 4055697, at *3. "As such, summary judgment in IDEA cases often

triggers more than an inquiry into possible disputed issues of fact." *S.F.*, 2011 WL 5419847, at *7. "Instead, the Court conducts an 'independent' review of the administrative record, basing its decision on the 'preponderance of the evidence.'" *P.G.*, 2013 WL 4055697, at *3 (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley,* 458 U.S. 176, 205 (1982) (citation omitted)).

Though the statute requires a "preponderance of the evidence" standard, 20 U.S.C. § 1415(i)(2)(C)(iii), the Second Circuit has observed that the analysis is complicated "by the fact that it occurs in the context of a complex statutory scheme involving institutional actors at different levels and within different branches of state and federal government." *M.H. v. New York City Dep't of Educ.,* 685 F.3d 217, 244 (2d Cir. 2012). "In the Second Circuit, this analysis requires more than a 'clear error' but less than a full *de novo* review." *P.G.*, 2013 WL 4055697, at *3 (quoting *M.H.*, 685 F.3d at 244). Judicial deference to the administrative proceedings "is particularly appropriate when . . . the state hearing officers' review has been thorough and careful." *Walczak v. Fla. Union Free Sch. Dist.,* 142 F.3d 119, 129 (2d Cir. 1998). If "the SRO's decision conflicts with the decision of the IHO, the IHO's decision may be afforded diminished weight." *A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.,* 553 F.3d 165, 171 (2d Cir. 2009).

Importantly, "the district court's determination of the persuasiveness of an administrative finding must . . . be colored by an acute awareness of institutional competence and role." *M.H.,* 685 F.3d at 244 ("[T]he purpose of the IDEA is to provide funding to states so that *they* can provide a decent education for disabled students consistent with their traditional role in educating their residents.") (emphasis in original). As a result, "determinations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the

IEP was developed according to the proper procedures" and "[d]ecisions involving a dispute over an appropriate educational methodology should be afforded more deference than determinations concerning whether there have been objective indications of progress." *Id.*

The IEP developed by the CSE must be "adequate." *R.E. v. N.Y. City Dep't of Educ.*, 694 F.3d 167, 190 (2d Cir. 2012). The adequacy of a student's IEP has both procedural and substantive components. *Id.* at 189-94; *see also Rowley*, 458 U.S. at 206-07. An IEP is procedurally adequate if it "complie[s] with the procedures set forth in the [IDEA]." *Rowley*, 458 U.S. at 207; *see also Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 190 (2d Cir. 2005). An IEP is substantively adequate if it is "reasonably calculated to enable [a] child to receive educational benefits." *Rowley*, 458 U.S. at 207. Plaintiffs allege that D.B.'s IEP contained both procedural and substantive violations of the IDEA, which resulted in D.B. being denied a FAPE. For the reasons set forth below, the Court concludes that D.B.'s 2010-11 IEP was procedurally and substantively sufficient to provide D.B. with a FAPE.

## III.    PROCEDURAL ADEQUACY

Plaintiffs allege that D.B.'s 2010-11 IEP contained four procedural deficiencies, each of which denied D.B. a FAPE. Specifically, they allege that D.B.'s 2010-11 IEP was procedurally inadequate because: (1) the CSE did not rely on sufficient evaluative data in developing the IEP; (2) the IEP did not provide for parent training or counseling; (3) the IEP did not include a methodology; and (4) Plaintiffs did not receive an adequate opportunity to participate in the IEP development process. Additionally, Plaintiffs argue that even if no single procedural violation denied D.B. a FAPE, when considered cumulatively, the procedural violations had that result. Pl. Mem. 8-15.

In determining whether an alleged procedural violation in a child's IEP resulted in the denial of a FAPE, the Court first must determine if the DOE deviated from the procedural requirements set forth in the IDEA. The statute is clear, however, that not every violation of the IDEA's procedural requirements will result in the denial of a FAPE. Rather, a procedural violation will result in the denial of a FAPE only if it: "(I) impeded the child's right to a [FAPE]; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE] to the parents' child; or (III) caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii). For the reasons set forth below, the Court concludes that the alleged procedural violations, whether considered individually or cumulatively, did not result in the denial of a FAPE.

**A.** <u>The Data the CSE Team Relied on in Drafting D.B.'s 2010-11 IEP was Sufficient</u>

Plaintiffs contend that the CSE team relied upon insufficient information in developing D.B.'s 2010-11 IEP, and failed to properly reevaluate D.B. prior to the CSE meeting, which impeded D.B.'s right to a FAPE. Pl. Mem. 8-10. Defendant argues that the Court should defer to the SRO, which found that the documents the CSE team reviewed -- which included the 2009 Report from the Rebecca School, D.B.'s 2009-10 IEP, and a November 2009 classroom observation of D.B. conducted by the DOE -- constituted "sufficient evaluative data with which to formulate [D.B.'s 2010-11 IEP]." SRO Dec. 14. As discussed below, this finding is supported by evidence in the record, *see* Ex. 12 at 3-5, and is therefore entitled to deference.

Any child who is eligible to receive a FAPE under the IDEA must be evaluated by his or her school district's CSE in order to "gather relevant functional, developmental and academic information about the student" necessary to measure the student's "educational and related services needs," which an IEP is designed to address. N.Y. Comp. Code R. & Regs. tit. 8 ("8

NYCRR"), § 200.4(b); *see also* 20 U.S.C. §§ 1414(a)-(c). New York law requires that a student be evaluated by the CSE prior to his initial IEP and at least once every three years thereafter. *See* 8 NYCRR § 200.4(b)(4). An evaluation may also be conducted if "the [CSE] determines that the [student's] educational or related services needs . . . warrant a reevaluation or if the student's parent or teacher requests a reevaluation." *Id.* The CSE is only required to review sufficient information to "adequately address[ ] [the student's] needs." *N.K. v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 5038 (JMF), 2013 WL 4436528, at *8 (S.D.N.Y. Aug. 13, 2013). In conducting its evaluation, the CSE team should "use a variety of assessment tools and strategies" and "not use any single measure or assessment as the sole criterion for . . . determining an appropriate educational program for the child." 8 NYCRR §§ 200.4(b), (j); 20 U.S.C. § 1414(b)(2)(A). However, "[t]he absence of one 'single measure' should not itself render an IEP invalid." *D.B. v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 4833 (DLC), 2013 WL 4437247, at *9 (S.D.N.Y. Aug. 19, 2013); *E.A.M. v. N.Y.C. Dep't of Educ.*, No. 11 Civ. 3730 (LAP), 2012 WL 4571794, at *9-10 (S.D.N.Y. Sept. 29, 2012).

Here, the SRO noted that the record was "not clear as to whether the student was required to have a triennial evaluation," but concluded that because the IEP itself was marked as an "annual review," and "the parents ha[d] not contested this," the DOE was not statutorily required to conduct a full evaluation. SRO Dec. at 13-14. This conclusion is amply supported by the record: first, the CSE meeting could have been rescheduled if either the Plaintiffs or the CSE team thought an evaluation was required, Tr. 137-38; second, M.L.B. was aware of her right to provide the CSE team with any evaluative information she wished for them to consider, Tr. 418-19; and third, M.L.B. did not object, during or after the CSE meeting, to the evaluative

16

information the CSE reviewed, or request that the CSE perform testing to obtain additional information about D.B.'s educational needs, Tr. 96, 410, 412.

Moreover, even if an evaluation was required, DOE's failure "to conduct [a] statutorily-mandated . . . reevaluation of the [s]tudent does not render [an] IEP procedurally defective" if the information provided to the CSE is sufficient to "directly assist persons in determining the educational needs of the student." *D.B.*, 2013 WL 4437247, at *9. The SRO properly determined that CSE relied upon sufficient information to determine D.B.'s needs, and the CSE was not statutorily required to conduct a reevaluation of D.B. SRO Dec. at 14. Thus, the CSE's decision to rely on existing evaluative data of D.B. did not constitute a procedural violation.

**B.** The Failure to Provide Parent Training and Counseling in the IEP Did Not Result in the Denial of a FAPE

Plaintiffs next argue that D.B.'s 2010-11 IEP was procedurally deficient because it did not provide for parent training and counseling, which impeded Plaintiffs' right to participate in the IEP development process. Pl. Mem. 13-14. The failure to include parent training and counseling in an IEP is a procedural violation, *see* 8 NYCRR § 200.13(d), and cannot be remedied by retrospective testimony indicating that the school district would have provided parent counseling and training. *R.E.*, 694 F.3d at 174, 186. The term "retrospective testimony" refers to "testimony that certain services not listed in the IEP would actually have been provided to the child if he or she had attended the school district's proposed placement." *R.E.*, 694 F.3d at 185. The SRO's reliance on such retrospective testimony (specifically, Ms. O'Connor's testimony that "the program [at P.169] encompasses parent training," Tr. 133) does not, however, render its conclusion regarding the IEP's procedural adequacy incorrect. Indeed, as the Second Circuit has held, the "failure to provide [parent] counseling ordinarily does not result in a FAPE denial or warrant tuition reimbursement." *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.,*

17

725 F.3d 131, 142 (2d Cir. 2013). This is especially true if, as here, the parents "received extensive parent training in the past and have been actively involved in their child's education, communicating regularly with [his] teachers and service providers." *M.M. ex rel. A.M. v. N.Y.C. Dep't of Educ.*, 583 F. Supp. 2d 498, 509 (S.D.N.Y. 2008). Thus, although this was a procedural violation, the Court defers to the SRO's determination that the omission of parent counseling and training from D.B.'s 2010-11 IEP did not result in the denial of a FAPE. *See* SRO Dec. at 20.

**C.** The Absence of a Methodology in the IEP Did Not Deprive D.B. of a FAPE

Plaintiffs third argument is that the fact that D.B.'s 2010-11 IEP did not include DIR/Floortime -- the "only methodology that worked for D.B.," Ex. 12 at 1-4 -- was a procedural violation that deprived D.B. of the opportunity to receive an educational benefit and, therefore, denied him a FAPE. Pl. Mem. 14-15.

Under the IDEA, a student who is entitled to "special education" services should receive "specially designed instruction," which requires "adapting, as appropriate to the [student's] needs . . . , the content, methodology, or delivery of instruction." 34 C.F.R. § 300.39(a)(3). As long as the methodologies referenced in the IEP are "appropriate to the [student's] needs," 34 C.F.R. § 300.39(a)(3), the omission of a particular methodology is not a procedural violation. *See R.E.*, 694 F.3d at 192-94 (finding IEP adequate when "the SRO found no evidence that he could not make progress with another methodology," but inadequate when there was "a clear consensus that [the student] required [a specific methodology]."); *see also Doyle v. Arlington Cnty Sch. Bd.*, 953 F.2d 100 (4th Cir. 1991).

Plaintiffs allege that "D.B.'s CSE file included documentation that other methodologies, including ABA and TEACCH, were inappropriate to use with D.B." Pl. Mem. 14-15. The only evidence from the record that they cite to in support of this argument is the testimony of Dr.

Salsberg. Pl. Mem. 15. As a preliminary matter, because this testimony was not available at the time of the CSE meeting, it is inappropriate for the Court to consider it at this time. *See R.E.*, 694 F.3d at 196 (holding that an IEP must be evaluated "prospectively as of the time of its drafting").

Moreover, even if the Court could consider Dr. Salsberg's testimony, that testimony would not support Plaintiffs' conclusion that neither ABA or TEACCH were appropriate for D.B. Although Dr. Salsberg testified that he did not think that TEACCH was "an appropriate modality for [D.B.]," there is evidence in the record indicating that ABA had been successfully used with D.B. in the past. Specifically, as noted above, and as summarized in Dr. Salsberg's 2010 report, "[i]n October 2001, [D.B.] was evaluated by Cecelia McCarton, M.D., who recommended Applied Behavioral Analysis (ABA) therapy at home and school. [D.B.] then attended an ABA classroom the following year at CPELC *with progress noted*, although no ABA therapies were provided within the home setting." Ex. 11 (emphasis added). And, Dr. Salsberg's own evaluation in 2002 included a recommendation for "home based ABA." Ex. 11.

Based on the evidence described above, the Court defers to the SRO's finding that there is no evidence in the record that DIR/Floortime was the only methodology from which D.B. could have received an educational benefit. SRO Dec. 22. Thus, the failure to include DIR/Floortime in D.B.'s 2010-11 IEP was not a procedural violation.

**D.** Plaintiffs Had the Opportunity to Participate in the Development of the IEP

Finally, Plaintiffs allege that they were not given a sufficient opportunity to participate in the development of the 2010-11 IEP, and that the recommended placement was predetermined. Pl. Mem. 15. Again, the Court concludes otherwise.

Federal and state regulations require that a child's parents be provided an opportunity to participate in the development of the child's IEP. 34 CFR § 300.322(a); 8 NYCRR § 200.4(d)(2). The Second Circuit has held that a parent receives such an opportunity when "[the parent] actively participate[s] in discussing [the student's] needs" and is "frequently consulted for input about the CSE[ ] [team's] proposed plan." *Cerra*, 427 F.3d at 193; *see also E.Z.-L. ex rel. R.L. v. N.Y.C. Dep't of Educ.*, 763 F. Supp. 2d 584, 596 (S.D.N.Y. 2011), *aff'd sub nom. R.E.*, 694 F.3d 167; *P.G.*, 2013 WL 4055697, at *9. The undisputed facts in this case demonstrate that Plaintiffs had such an opportunity. As noted, M.L.B. was able to express her concerns about D.B.'s needs at the CSE meeting, Def. 56.1 ¶ 11-12, and the CSE team (which included M.L.B.) discussed each section of the draft IEP, modified the draft IEP based on input from M.L.B. and Ms. Swope, and ultimately agreed upon the IEP that was developed. Ex. 12 at 2, 3; Tr. 89-90, 92-93, 384-85. These facts are substantially similar to those that the Second Circuit found sufficient in *Cerra*, 427 F.3d at 192-193. As such, the Court will defer to the SRO's conclusion that Plaintiffs had an opportunity to meaningfully participate in developing D.B.'s 2010-11 IEP, *see* SRO Dec. at 12, and concludes that there was no procedural violation based on Plaintiffs' ability to participate in drafting the 2010-11 IEP.

E. Cumulatively, the Procedural Violations Did Not Result in the Denial of a FAPE

Even if none of the procedural violations in an IEP considered in isolation, denies the student a FAPE, such violations may result in the denial of a FAPE when considered cumulatively. *R.E.*, 694 F.3d at 190 ("[E]ven minor violations may cumulatively result in a denial of a FAPE."). Because the Court concluded that only one of the four alleged violations was in fact a procedural violation, that violation -- the failure to include parent counseling and training in the IEP -- has no cumulative effect. *C.f., R.E.*, 694 F.3d at 192-196 (analyzing the

20

cumulative effect of the determined, rather than alleged, procedural violations in three IDEA cases). And, as discussed above, the Second Circuit has held that this failure, standing alone, does not rise to the level of a denial of a FAPE. *M.W.*, 2013 WL 3868594, at *7; *R.E.*, 649 F.3d at 191. Thus, the Court concludes that, whether considered individually or cumulatively, the alleged procedural violations did not deny D.B. a FAPE.

## IV.    SUBSTANTIVE ADEQUACY

Plaintiffs also claim that D.B.'s 2010-11 IEP was substantively inadequate for four reasons: first, the annual goals and short-term objectives in D.B.'s 2010-11 IEP were inappropriate; second, the program recommended in the IEP would have caused D.B. to regress; third, the recommended school would not have been able to provide D.B.'s mandated related services; and fourth, D.B. would not have been functionally grouped in the recommended class. Pl. Mem. 15-23. Defendants urge the court to adopt the SRO's conclusion that none of these alleged deficiencies rendered D.B.'s 2010-11 IEP substantively inadequate. Def. Mem. 8-10, 14-17.

An IEP is substantively adequate if it is "reasonably calculated to enable [a] child to receive educational benefits." *Cerra*, 427 F.3d at 190 (quoting *Rowley*, 458 U.S. at 207). Pursuant to Second Circuit precedent, an IEP is substantively adequate if it is "'likely to produce progress, not regression' and 'affords the student . . . an opportunity greater than mere trial advancement.'" *E.S. ex rel. B.S. v. Katonah Lewisboro Sch. Dist.*, 487 F. App'x 619, 621 (2d Cir. 2012) (quoting *Cerra*, 427 F.3d at 195). Any substantive inadequacy in a student's IEP results in the denial of a FAPE. *See M.W.*, 725 F.3d at 131 (2d Cir. 2013) (quoting *R.E.*, 694 F.3d at 190). For the reasons discussed below, the Court agrees with the SRO's conclusion that D.B.'s 2010-11 IEP was substantively adequate.

**A.** The Goals in D.B.'s 2010-11 IEP Were Appropriate

Plaintiffs argue that the goals in D.B.'s 2010-11 IEP were inappropriate because: (1) they were copied from D.B.'s 2009 Report goals; (2) the annual goals were "immeasurable;" (3) the report recommended adapted PE, but did not have annual goals or short-term objectives for PE; and (4) because the IEP referred to, but did not provide for, home-based services. The Court will examine each of these in turn.

*1.     There is No Evidence to Support Plaintiffs' Contention that the Goals from the 2009 Report Were Inappropriate to Include in D.B.'s 2010-11 IEP*

Plaintiffs assert that the annual goals in D.B.'s 2010-11 IEP were inappropriate because they were copied from the 2009 Report goals, which were designed to be achieved in the six months after the Report was prepared, prior to the start of the 2010-11 school year for which the IEP was created. Pl. Mem. 10. While all of Plaintiff's points are correct, they do not render the goals in the IEP *per se* inappropriate. Indeed, in a recent case from this district, *A.M. ex rel. Y.N. v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 5573 (JMF), 2013 WL 4056216 (S.D.N.Y. Aug. 9, 2013), the court considered and rejected this same argument in a case with analogous facts. In *A.M.*, a CSE team met in January 2010 and developed a 2010-11 IEP largely based on the student's November 2009 school progress report. *Id.* at *8, *12. The court rejected plaintiffs' argument that the annual goals in the student's IEP were "redundant because if she were to achieve her 2009-2010 academic goals, there would be no benefit to the IEP for the 2010-2011 academic year," and noted that there was "no authority for the proposition that drawing goals from a teacher's progress report is a violation of the [applicable law] or regulations." *Id.* at *12; *see also M.S. v. N.Y.C. Dep't of Educ.*, No. 09 Civ. 4454 (LAK) (JCF), 2010 WL 9446052, at *23 (S.D.N.Y. Mar. 12, 2010) (upholding SRO's determination that goals copied from prior IEP were adequate). The Court agrees with that court's observations and conclusions.

22

Furthermore, in this case, no one objected to the goals discussed at the CSE meeting, Tr. 96; Ex. 12 at 2-2, Ms. Swope (D.B.'s teacher at the Rebecca School) stated that she believed the goals were appropriate. Ex. 12 at 2-2; Def. 56.1 ¶ 26, and Plaintiffs did not object to the goals in their subsequent communications with the DOE. Tr. 410. Given Plaintiffs' failure to object to the annual goals in the 2010-11 IEP and the SRO's findings that the annual goals were adequate, Plaintiffs' argument on this point is without merit.

### 2. The Detailed and Measurable Short-Term Objectives in the IEP Remedied Any Deficiencies in the Annual Goals

Plaintiffs next contend that the annual goals in D.B.'s 2010-11 IEP are "immeasurable." Pl. Mem. 10. The SRO agreed; but found that the annual goals were adequate because "the short term objectives 'contained sufficiently detailed information regarding the conditions under which each objective was to be performed and the frequency, duration, and percentage of accuracy required for measurement of progress' and remedied any deficiencies in the annual goals." SRO Dec. at 16 (quoting *Tarlowe v. N.Y.C. Bd. of Educ.*, No. 07 Civ. 7936 (GEL), 2008 WL 2736027, at *9 (S.D.N.Y. July 3, 2008)).

The annual goals in a student's IEP must contain "evaluative criteria, evaluation procedures and schedules to be used to measure progress toward meeting the annual goal." 8 NYCRR § 200.4(d)(2)(iii)(b); *see also* 20 USC § 1414(d)(1)(A)(i)(II). In addition, the IEP must "identify when periodic reports on the progress the student is making toward the annual goals . . . will be provided to the student's parents." 8 NYCRR § 200.4(d)(2)(iii)(c). However, "[t]he cases in this Circuit demonstrate that 'even where certain goals are overly broad, courts have found an IEP to be satisfactory where short-term objectives are sufficiently detailed.'" *E.F. v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 2217 (MKB), 2013 WL 4495676, at *19 (E.D.N.Y. Aug. 19, 2013) (quoting *C.D. v. Bedford Cent. Sch. Dist.*, 10 Civ. 5502 (CM), 2011 WL 4914722, at *8

(S.D.N.Y. Sept. 22, 2011)).  Contrary to Plaintiffs contention, Pl. Mem. 11, nothing in the state or federal statute requires that an IEP contain "baseline levels of functioning" from which progress can be measured.

The short-term objectives in D.B.'s 2010-11 IEP contain evaluative criteria:  each objective contains either the percentage of accuracy or number of trials at which the goal must be performed.  Ex. 12; *see e.g., W.T. and K.T. ex rel. J.T. v. Bd. of Educ.*, 716 F. Supp. 2d 270, 289 (S.D.N.Y. 2010); *M.H. v. N.Y.C. Dep't of Educ.*, 712 F. Supp. 2d 125, 156 (S.D.N.Y. 2010).  With regard to evaluative procedures, D.B.'s 2010-11 IEP does not indicate methods of measurement for the annual goals.  However, the "Participation in Assessments" section of the IEP  indicates that D.B. will be assessed by "observations, teacher made assessments, [and a] student portfolio," Ex. 12 at 3-15, which satisfies the requirement that the goals contain evaluative procedures.  *See K.L. ex rel. M.L. v. N.Y.C. Dep't of Educ.*, No. 10 Civ. 3733 (KBF), 2012 WL 4017822, at *11 (S.D.N.Y. Aug. 23, 2012), *aff'd*, No. 12-3893-cv, 2013 WL 3814669 (2d Cir. July 24, 2013) (finding IEP substantively adequate even though it "[did] not provide 'methods of measurement' for each of [the student's] goals, because the 'participation in assessments' section states that [the student] would be assessed by '[t]eacher made materials and observations'").  Finally, the pages of D.B.'s 2010-11 IEP that list his annual goals and short-term objectives indicate "[t]here will be 3 reports of progress per year," Ex. 12, which fulfills the requirement that the goals contain evaluative schedules.  *See M.H.*, 712 F. Supp. 2d at 156 (concluding that the statement in an IEP that "[t]here will be 4 reports of progress per year" sufficed as an evaluative schedule).  Thus, the SRO's finding that "the annual goals, when combined with the short-term objectives, were sufficient," SRO Dec. at 18, is supported by the record and entitled to deference.

   3.    *The Annual Goals Meet D.B.'s Needs for Adapted Physical Education*

Plaintiffs also allege that, because D.B.'s 2010-11 IEP recommended adapted PE, it should have contained specific annual goals and short-term objectives for PE. Pl. Mem. 11-12. This notwithstanding, the SRO determined that D.B.'s 2010-11 IEP was sufficient to meet his needs in adapted PE. *See* SRO Dec. at 17-18.

Pursuant to the New York statute, a child's IEP must contain goals "relate[d] to" each of the child's educational needs. 8 NYCRR § 200.4(d)(2)(iii)(A); *see also* 39 C.F.R. § 300.320(a)(2)(i) (IEP must contain goals "designed to meet" child's needs). The statute does not require that the IEP contain goals that explicitly reference each need. The record here shows that, as required, D.B.'s IEP contained annual goals and short-term objectives that were "related to" adapted PE. *See, e.g.*, Ex. 12 at 3-11 (noting that "[D.B.] will play a variety of games" such as "obstacle courses, catch & chase games . . . with an adult or peer"). As the SRO's determination is supported by the record, the Court defers to it and concludes that the annual goals regarding adapted PE were sufficient.

   4.    *References to the "Home Environment" in D.B.'s Annual Goals Do Not Indicate that Home-Based Services Were Required*

Plaintiffs argue that, because two of the goals in the 2010-11 IEP contain references to the "home environment[ ]," Ex. 12 at 3-11, the IEP must provide home-based services. Pl. Mem. 12-13. While the record indicates that D.B. may have *benefited* from home-based services, it contains no indication that such services were *necessary*. *See N.K.*, 2013 WL 4436528, at *13 (record showed music therapy was "beneficial for [the student]" but did not "support the conclusion that [the student] could not have a FAPE without it"). As such, the Court defers to the SRO's conclusion that the failure of D.B.'s 2010-11 IEP to provide home-based services did not result in the denial of a FAPE. *See* SRO Dec. at 17-18. Thus, the Court concludes that, as a

whole, the goals in D.B.'s 2010-11 IEP were appropriate and did not amount to a substantive violation that resulted in D.B. being denied a FAPE.

**B.** <u>The 6 : 1 : 1 Program Recommended by the CSE Team Was Appropriate for D.B.</u>

Plaintiffs allege that the recommended 6 : 1 : 1 program was the DOE's "standard default" program, and was not individualized for D.B. Pl. Comp. ¶¶ 29-30. D.B.'s 2010-11 IEP indicates that the CSE considered both 10-month and 12-month programs, but rejected a 10-month program as "inadequate to meet [D.B.]'s academic [and] social/emotional needs." Ex. 12. Similarly, in addition to the recommended 6 : 1 : 1 staffing ratio, the CSE team considered 12 : 1: 1 and 8 : 1 : 1 ratios, but rejected them as "too high to appropriately meet [D.B.]'s needs." Ex. 12. Ms. O'Connor testified that the entire team agreed that a 6:1:1 program was appropriate for D.B., and no one at the meeting raised any objections to the program. Tr. 100. Thus, there is ample evidence in the record to support the SRO's finding that the program recommended in D.B.'s 2010-11 IEP was not predetermined. *See J.G. ex rel. N.G. v. Kiryas Joel Union Free Sch. Dist.*, 777 F. Supp. 2d 606, 650 (S.D.N.Y. 2011). Moreover, the fact that the DOE did not consider programs beyond those it typically offered does not warrant a finding of a denial of a FAPE. *See M.H.*, 685 F.3d at 257.

Plaintiffs also argue that the SRO's decision that the district's 6 :1 : 1 program was appropriate for D.B. was "inadequately reasoned," because the SRO did not discuss the testimony of Dr. Salsberg, upon which the IHO relied. Dr. Salsberg opined, based on his observations of the district's 6 : 1 : 1 programs,[4] that the "intensity . . . specialty and . . . individualization . . . and [highly qualified] aides in th[e] classroom" that D.B. receives at the Rebecca School are "very rare" in the district. Tr. 333. The SRO did not err in disregarding this testimony, as the appropriateness of the DOE's program is determined by its compliance with the

---

[4] Dr. Salsberg's testimony does not indicate whether he had ever observed any 6 : 1 : 1 classes at P.169.

IDEA's requirements, not by its similarity (or lack thereof) to the Rebecca School's program. *See Bryant v. N.Y. State Educ. Dep't*, 692 F.3d 202, 215 (2d Cir. 2012) ("The IDEA guarantees only that students with disabilities are provided "an 'appropriate education,' not one that provides everything that might be thought desirable by loving parents.") (quoting *Walczak*, 142 F.3d at 132).

Plaintiffs' finally argue that the SRO erred in failing to consider the testimony of Ms. McCourt, Ms. Cohn, and M.L.B. regarding the recommended program. The record shows, however, that neither Ms. McCourt nor Ms. Cohn opined on the appropriateness of a 6:1:1 program for D.B. The record does show that M.L.B. told the CSE team she was concerned about a 6 : 1 : 1 program because the DOE "considers that class size for very low functioning children, and that's not where D.B. falls in terms of functioning levels." Tr. 386. M.L.B. also indicated that she "would like [D.B.] to be in a small classroom with appropriate peers," Tr. 386, but she did not argue that a 6 : 1 : 1 program could not meet these criteria or ask the DOE to consider a different program. This testimony does not provide evidence that a 6 : 1 : 1 program was inappropriate for D.B. or that it was an error for the SRO to not properly consider M.L.B.'s testimony in concluding that the 6 : 1 : 1 program was appropriate.

### C. There is Insufficient Evidence to Conclude That the Specific School Recommended by the DOE Would Have Denied D.B. a FAPE

Plaintiffs contend that P.169 was an inappropriate placement because the school could not have provided D.B.'s mandated related services. In support of this claim, Plaintiffs cite the DOE's website, which indicates that a significant percentage of students at P.169 did not receive their mandated related services for the 2009-10 school year. Pl. Mem. 22. However, "documents show[ing] that a large percentage of the students at [the proposed school] have been and continue to be underserved for related services, particularly as to occupational therapy . . . .

cannot overcome the 'particularly important' deference . . . afford[ed] to the SRO's assessment of [an IEP]'s substantive adequacy." *F.L. ex rel. F.L. v. N.Y.C. Dep't. of Educ.*, 2012 WL 4891748, at *16 (quoting *R.E.*, 694 F.3d at 195). In addition, although Plaintiffs cite Ms. Velazquez's testimony regarding "shortage[s]" of related service providers, Ms. Velazquez herself explained that this "shortage" did not prevent the district from meeting students' related service needs; and that if P.169 could not provide related services, it would issue an authorization to allow D.B. to obtain such services outside of school at the district's expense. Tr. 132. Plaintiffs' claim that out of school services would be insufficient because D.B.'s 2010-11 IEP "explicitly mandated" that he receive his OT during the school day, Pl. Mem. 23, is not supported by the record.

Plaintiffs also argue that P.169 was inappropriate for D.B. because the school did not have "suspended equipment." Pl. Reply 2. The Court disagrees. While the 2009 Report indicates that D.B. requires "intense vestibular input," there is no evidence in the record that suspended equipment is necessary to provide this input. Ex. 12. Moreover, even if suspended equipment were required to implement D.B.'s 2010-11 IEP, Plaintiffs have not shown that the school district was unwilling or unable to obtain such equipment. *See N.K.,* 2013 WL 4436528, at *13; *Reyes ex rel. R.P. v. N.Y.C. Dep't of Educ.*, 12 Civ. 2113 (WHP), 2012 WL 6136493, at *7 (S.D.N.Y. Dec. 11, 2012).

### D. The Court May Not Consider Evidence Regarding the Specific Classroom in Which D.B. May Have Been Placed

Finally, Plaintiffs object to the functional grouping of students in the specific class proposed by the DOE. Pursuant to Second Circuit precedent, "courts are prohibited from evaluating the adequacy of an unimplemented IEP based on evidence about the particular classroom in which a student would be placed." *N.K*, 2013 WL 4436528, at *11 (citing *R.E.*,

694 F.3d at 186-87). Accordingly, the Court does not reach this contention.[5] Nor does M.L.B.'s opinion regarding the appropriateness of the P.169 placement, based on her observations of particular classes during her school visit, give cause to question the SRO's conclusion. *F.L.,* 2012 WL 4891748, at *14 ("[M]other's testimony as to the functioning of other students [whom she observing during a school visit] is insufficient to warrant a finding that [the student]'s IEP was not reasonably calculated to confer educational benefits." (citation and internal quotation marks omitted)); *see also A.M.,* 2013 WL 4056216, at *13. Though M.L.B.'s observations may have caused her to speculate that P.169 was incapable of adhering to D.B.'s 2010-11 IEP, "speculation . . . is not an appropriate basis for unilateral placement." *R.E.,* 694 F.3d at 195. Certainly, nothing about this testimony can "overcome the 'particularly important' deference that we afford the SRO's assessment of the plan's substantive adequacy." *Id.* (citing *Cerra,* 427 F.3d at 195). Finally, to the extent that Dr. Salsberg's testimony regarded the possibility that D.B. would regress in the proposed class, this testimony was not "reasonably known to the parties at the time of the placement decision," and use of that testimony to question the appropriateness of the placement or the IEP runs contrary to the Second Circuit's directive that an "IEP must be evaluated prospectively as of the time of its drafting." *R.E.,* 694 F.3d at 186.

### E. The IEP was Substantively Adequate

For the reasons discussed above, the Court concludes that the SRO's determinations with regard to the substantive adequacy of D.B.'s 2010-11 IEP were well supported by the record and

---

[5] Even if the Court were to consider such evidence, the record suggests that D.B. would have been functionally grouped in the assigned class. He was within the age and functional ranges of students in the proposed class, *compare* Ex. 12, *with* Tr. 21, and Ms. Klemm testified D.B. was similar to students in terms of his academic, social, and behavioral needs. Tr. 33-35, 38; *E.A.M.,* 2012 WL 4571794, at *12 (upholding SRO's determination that student would have been functionally grouped when student's reading and math levels were within the range of students in the proposed class, and student's needs were similar to those of students in proposed class).

are entitled to the full degree of deference. Accordingly, as did the SRO, the Court concludes that the 2010-11 IEP was substantively adequate.

## V.    CONCLUSION

For the foregoing reasons, the Court concludes that the 2010-11 IEP was both procedurally and substantively adequate. As such, the Court need not reach Plaintiffs' claims regarding the propriety of their unilateral placement of D.B. at the Rebecca School. Regardless of the adequacy of that school, the DOE need not reimburse Plaintiffs for tuition for the 2010-11 school year because it offered D.B. a FAPE for that year. Defendant's Motion for Summary Judgment is GRANTED. Plaintiffs' Motion for Summary Judgment is DENIED in full.

This Memorandum and Order resolves Docket Numbers 10 and 14. The Clerk of the Court is directed to terminate this action.

SO ORDERED.

Dated: September 27, 2012
　　　 New York, New York

_____
ALISON J. NATHAN
United States District Judge